**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

CATHERINE M. FARINA

                                        Plaintiff,

        v.                                                              No. 13-CV-1246
                                                                              (TJM/CFH)

CAROLYN W. COLVIN, Commissioner of
Social Security Administration,

                                        Defendant.

_____

**APPEARANCES:**                                  **OF COUNSEL:**

THE OLINSKY LAW GROUP                   HOWARD D. OLINSKY, ESQ.
Attorney for Plaintiff
300 S. State Street
Fifth Floor, Suite 520
Syracuse, New York 13202

HON. RICHARD S. HARTUNIAN                TOMASINA DiGRIGOLI, ESQ.
United States Attorney for the          Special Assistant United States Attorney
    Northern District of New York
Attorney for Defendant
Room 218
James T. Foley U.S. Courthouse
Albany, New York 12207

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

    Plaintiff Catherine M. Farina ("Farina") brings this action pursuant to 42 U.S.C. §

405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying her application for benefits under the Social Security Act.

Farina moves for a finding of disability and the Commissioner cross-moves for a

_____

    [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

judgment on the pleadings.  Dkt. Nos. 13, 14.  For the reasons which follow, it is recommended that the Commissioner's decision be affirmed.

## I. Background

### A. Facts

Born on April 7, 1983, Farina was twenty-one years old on the alleged disability onset date.  T. 41-42.[2]  Farina graduated from high school with an Individualized Education Program ("IEP") diploma[3] after taking special education classes for the majority of her schooling.  T. 47, 54.  Farina's previous work experience included gathering shopping carts at grocery stores, dishwashing, and a brief time arranging flowers.  T. 42-45, 54-55.  Farina alleges disability from intellectual disability[4].  T. 41-42.

### B. Procedural History

On December 13, 2010, Farina protectively filed an application for supplemental

---

[2]"T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner.  Docket No. 8.

[3] An IEP diploma provides

> recognition [for] an individual student's achievement of . . . her educational goals based on the appropriate level of the learning standards as specified in the student's current IEP[; however,] it is not a standards-based diploma and not recognized in this State as equivalent to a regular high school diploma.  Therefore, a student who exits school with an IEP diploma, and not a regular diploma, is likely to be significantly limited in . . . her post-secondary education opportunities, employability and earning potential.

Memorandum from James P. DeLorenzo on the Individualized Education Plan (IEP) Diploma, available at: http://www.p12.nysed.gov/specialed/publications/iepdiploma.htm (last visited Aug. 27, 2014).

[4] Intellectual disability was formerly referred to as mental retardation.

security income claiming an alleged onset date of May 2, 2005[5].  T. 21, 201-206, 214.

That application was denied on February 1, 2011.  T. 79-86.  Farina requested a

hearing before an administrative law judge ("ALJ") and a hearing was held before ALJ

David J. Begley on February 1, 2012.  T. 36-75, 91-129.  In a decision dated July 13,

2012, the ALJ held that Farina was not entitled to disability benefits.  T. 18-31.  Farina

filed a timely request for review, and on September 24, 2013, the Appeals Council

denied Farina's request, thus making the ALJ's findings the final decision of the

Commissioner.  T. 5-17.  This action followed.


## II. Discussion

### A.  Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision.  Berry, 675 F.2d at 467.  Substantial evidence is "more than a mere scintilla,"

meaning that in the record one can find "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28,

31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal

citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with

sufficient specificity to allow a court to determine whether substantial evidence supports

the decision."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y.

---

[5] At the hearing, Farina's counsel sought to amend the alleged onset date from May 2, 2005 to April 1, 2005.  T. 21, 41.

2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). If the Commissioner's finding is supported by substantial evidence, it is conclusive. 42 USC § 405(g) (2006); Halloran, 362 F.3d at 31.

## B. Determination of Disability[6]

"Every individual who is under a disability shall be entitled to a disability. . . benefit. . . ." 42 U.S.C. § 423(a)(1) (2004). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 423(d)(1)(A). A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. Id. § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts,

---

[6] While the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably." Donato v. Sec 'y of Health and Human Servs., 721 F.2d 414, 418 n. 3 (2d Cir.1983) (citation omitted).

subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. 04-CV-9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work. Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). The plaintiff bears the initial burden of proof to establish each of the first four steps. DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. Id. at 1180 (citing Berry, 675 F.2d at 467).

## C. ALJ Begley's Findings

Farina, represented by an attorney, as well as her boyfriend, testified at the hearing held on February 1, 2012.  T. 36-75 (transcript from the administrative hearing).  Using the five-step disability sequential evaluation, the ALJ found that Farina (1) had not engaged in substantial gainful activity since December 13, 2010, the application date; (2) had a severe medically determinable impairment, specifically a learning disability; (3) did not have an impairment, alone or in combination, sufficient to meet the listed impairments in Appendix 1, Subpart P of Social Security Regulation Part 404; (4) maintained "the residual functional capacity [("RFC")] to perform a full range of work at all exertional levels, limited to only simple, routine, repetitive tasks in work environments without fast-paced production requirements and with few, if any, workplace changes," and thus, (5) remained capable of performing work which exists in significant numbers in the national economy.  Therefore, a determination of not disabled was made.

## D.  Farina's Contentions

Farina contends that the ALJ erred in (1) failing to develop the record and ensure that Farina received an IQ consultative examination; (2) failing to determine that Farina's impairments were sufficient to meet one of the Listings; (3) improperly discrediting Farina's testimony; and (4) concluding that substantial evidence in the record supported a finding that Farina retained sufficient residual functional capacity (RFC) to perform work.

### 1. Duty to Develop the Record

Farina contends that the ALJ acted in error when he failed to ultimately require an IQ consultative examination of her prior to rendering a decision on disability.  During Farina's hearing, counsel requested that she be sent to a consultative evaluation for IQ testing.  T. 73.  The ALJ agreed and explained to Farina the purpose of a consultative evaluation and that her cooperation in such proceedings was required.  T. 73-74.  On April 20, 2012, counsel for Farina wrote to ALJ Begley inquiring about the status of the consultative examination.  T. 199.  Counsel authored a second letter on April 30, 2012, outlining that he had spoken with chambers staff who had informed him that Farina had missed two scheduled consultative examination appointments.  T. 200; see also T. 297-98 (disability worksheet indicating that letters were sent to Farina informing her that examinations had been scheduled for February 24, 2012 and March 9, 2012 and that Farina failed to appear at either appointment).  Counsel contends that neither he nor Farina received notifications of these consultative examinations and thus there was a good reason for Farina's failure to appear.  Pl. Mem. of Law (Dkt. No. 13) at 5-6.  Moreover, Farina proffers that failure to procure a consultative examination resulted in a gap in the record, rendering the ALJ unable to make a proper determination in Farina's case.

On July 5, 2012, Farina submitted additional evidence to the ALJ for his consideration.  T. 312.  Included in that evidence were an evaluation and medical source statement from a licensed psychologist retained by Farina, Dr. Stephan Coleman.  T. 305-311.  Dr. Coleman provided Farina with an updated psychological evaluation.  T. 305-308.  In that evaluation, Dr. Coleman administered "the Wechsler

Adult Intelligence Scale-Fourth Edition (WAIS-IV) [test], a well-known standardized

cognitive assessment instrument."  T. 306.  Dr. Coleman noted that Farina's

"[l]ong-term memory was poor," though she had an "upbeat and even buoyant . . .

affect" throughout the assessment despite "struggl[ing] with some expressive language

aspects of the interview . . . ."  Id.  Farina reported that she occasionally cooks,

regularly washes clothes and cleans, and cares for her two infant children and

numerous pets.  Id.  Dr. Coleman noted "no symptomatology related to anxiety,

depression, []or other affective difficulties."  Id.

> Farina 's

> cognitive assessment instrument yielded a Full Scale IQ
> standard score of 61 . . . [and] . . . all of the various subtest
> scores are clearly within the delayed level of functioning . . .
> plac[ing] . . . Farina within the middle of the mildly mentally
> retarded range of overall cognitive functioning . . . in . . .
> close conformity with a previous Wechsler IQ test score
> obtained when . . . Farina was 11 years of age (56 Full Scale
> IQ score).

T. 307.  Dr. Coleman concluded that "given . . . Farnia's need for significant structure

and supports in special education programming throughout most of her formal

schooling, she is seen to be an individual considered disabled . . . ."  Id.  Dr. Coleman

also stated that "Farina would have had difficulties in her various competitive

employment situations . . . given her multiplicity of challenges, particularly in the areas

of short-term auditory . . . [and] long-term memory, verbal skills, mental arithmetic

computation, visual perceptual and visual-motor skills development . . . ."  Id.  Dr.

Coleman assessed that Farina was "solidly functioning within the mildly mentally

disabled range according to a well-recognized cognitive assessment instrument

administered recently [which was] . . . in conformity with previous findings . . . ." Id. Dr.

Coleman recommended Farina work in "sheltered workshop types of work . . . or

perhaps a sheltered work enclave." T. 307-308.

In this case Farina makes multiple contentions related to the ALJ's duty to develop

the record. The first is that, pursuant to the ALJ's statements at the hearing, a

consultative examination was necessary to make a disability determination based upon

substantial evidence. Accordingly, Farina argues that there is a gap in the record which

the ALJ failed to remedy. An ALJ has an affirmative duty to develop the administrative

record during Social Security hearings, even when the claimant is, as in this case,

represented by counsel[7]. See Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) (citations

omitted); see also 20 C.F.R. § 404.1512(d) (describing Commissioner's duty to develop

a "complete medical history for at least the [twelve] months preceding the month in

which [claimant] file[s an] application . . . ."); 20 C.F.R. § 404.1512(e)(explaining how

the Commissioner will attempt to retrieve the entire medical history from claimant's

treating sources as opposed to always seeking consultative examinations).

Accordingly, "[t]he ALJ's duty to supplement a claimant's record is triggered by

ambiguous evidence, the ALJ's finding that the record is inadequate or the ALJ's

---

[7] This duty exists, in varying degrees, depending upon whether or not the claimant is represented and in what capacity. See Smith v. Bowen, 687 F. Supp. 902, 906 (S.D.N.Y. 1988) ("The ALJ's duty to develop the comprehensive record . . . is greatest when claimant is unrepresented; but the duty still exists when plaintiff is represented and even more . . . where plaintiff if represented . . . by a paralegal."); see also Cruz v. Sullivan, 912 F.2d 8, 11, (2d Cir. 1990) ("[W]hen the claimant is unrepresented, the ALJ is under a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all of the relevant facts.") (internal quotation marks and citations omitted).

reliance on an expert's conclusion that the evidence is ambiguous." Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (citations omitted); see also Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.") (citations omitted); Roat v. Barnhart, 717 F. Supp. 2d 241, 264 (N.D.N.Y. 2010) (holding that where a "medical record paints an incomplete picture of [claimant's] overall health during the relevant period, as it includes evidence of the problems, the ALJ had an affirmative duty to supplement the medical record, to the extent it was incomplete, before rejecting [claimant's] petition.") (internal quotation marks and citations omitted).

However, an ALJ is "not required to order an IQ test in order to fully assess . . . cognitive abilities . . . where there are no obvious gaps in the administrative record . . . ." Bushey v. Colvin, 552 Fed App'x 97, 98 (2d Cir. 2014) (quoting Rosa v Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (internal quotation marks omitted)).  In this case, there was no gap in the record because Farina produced a current IQ assessment by a professional in the practice area, Dr. Coleman.  When determining whether subsections C or D of Listing 12.05 are applicable, the claimant must demonstrate first "[a] valid verbal, performance, or full scale IQ [score] of 60 through 70 . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1. The statute, by explicitly using the connector "or", directs that only one of those three quantitative assessments is required to evaluate whether the Listings are applicable.  Therefore, there was no missing medical information as the full IQ score alone was sufficient to evaluate whether Farina had a per se disability.

Further, "IQ tests create a rebuttable presumption of a fairly constant IQ throughout

a person's life . . . Absent evidence of a change in [the plaintiff's] intellectual functioning, it is appropriate to assume that the results of an IQ test administered after age 22 accurately reflects the . . . IQ prior to age 22." Mendez v. Astrue, No. 11-CV-276S, 2012 WL 3095587, at *3 (W.D.N.Y. July 30, 2012) (internal citations omitted). Accordingly, that assessment is presumed to represent a fair depiction of Farina's IQ. Moreover, such assumptions are bolstered by the fact that the evaluation is consistent with the last known evaluation in 1996. During that evaluation, Mark Breindel, the school psychologist, noted that Farnia's IQ score had risen as the 1996 results "represent[ed] a 10-point gain in terms of standard scores compared to three years ago . . . [as well as] approximately a 20-point gain in verbal-vocabulary functionl," leading to the conclusion that Farina was "functioning in the deficient to borderline level of intelligence." T. 279.

In addressing the fact that the 1996 evaluation differed from the initial evaluation completed in 1993, Breindel explained the inconsistency, namely Farina's increased IQ score, in the later evaluation. T. 278. Breindel stated that the 1993 evaluation "revealed . . . a full scale I.Q. of 56 . . . [however, Farina's] overall adaptive behavior was not termed as consistent with the diagnosis of mentally retarded. Instead the examiner felt that [she] had severe language and processing difficulties." T. 278. So, as to the slight IQ score differences that appear between the 1993 evaluation and the 1996 and 2012 evaluations, any concern about the significance of these inconsistencies were dispelled by the conclusion that the 1993 score was not appropriately representative of Farina's capabilities because it was skewed due to her language and processing difficulties. Moreover, the fact that both later evaluations

share consistent findings regarding Farina's intellect and capabilities gives further credence to the ALJ's decision to utilize the higher IQ score and, ultimately, his disability determination. Thus, these conclusions serve as substantial evidence to support the ALJ's decision that Farina's mental impairments were not sufficient to establish a per se disability.

To the extent that Farina contends that Dr. Coleman's assessment was incomplete because he did not list sub-scores of the IQ evaluation in his report, such claims are meritless. As previously discussed, an ALJ is required to develop a complete medical record, even when a claimant is represented by counsel. See Perez, 77 F.3d at 47. However, the record before the ALJ was not incomplete. All that was required pursuant to 12.05 was the provision of one of the sub-scores. See 20 C.F.R. Pt. 404, Subpt. P, App. 1 (directing that the claimant must demonstrate first "[a] valid verbal, performance, or full scale IQ [score] of 60 through 70 . . . .").

To the extent that Farina contends that these sub-scores were necessary to determine the true extent of Farina's disability and whether the Listings truly applied, these allegations are also meritless. It is the plaintiff's burden to establish disability throughout the first four steps of the analysis. DeChirico, 134 F.3d at 1179-80. It is undisputed that "the regulations require that the ALJ consider the lowest IQ score for purposes of determining whether Listing 12.05 is met." Cousino v. Comm'r of Soc. Sec., No. 2:12-CV-258, 2013 WL 4809267, at *5 (D. Vt. Sept. 10, 2013). Accordingly, where scores for "verbal, performance, and full scale IQs are provided . . . [the ALJ] use[s] the lowest of these [scores] in conjunction with [determining eligibility under] 12.05." Id. (citing 20 C.F.R. pt. 404, subpt. P, app.2 section 12.00(D)(6)(c)).

Farina was well aware of what Dr. Coleman's assessment and conclusions were as she retained that expert and submitted his opinion to the ALJ for review. Those conclusions included solely a full IQ scale. The statute, by explicitly using the connector "or", directs that only one of those three quantitative assessments is required to begin the determination for the Listings. However, where multiple figures are present, the lowest one will be used in the disability determination. The fact that Dr. Coleman did not include the two additional figures for verbal and performance scores did not leave a gap in the record. The full scale IQ figure was sufficient to determine whether the first prong of subsections C and D had been satisfied. If Farina felt that those additional figures would have helped her in the disability determination, that was her burden to seek out and submit the information. The report which was authored by Dr. Coleman was clear. Not only was there not a gap in the record, Dr. Coleman's findings required no further clarification. Accordingly, the ALJ's determination should be affirmed.

Alternatively, Farina argues that the ALJ failed to accommodate Farina's absences from the consultative examinations. Farina contends that these should have been forgiven as she never received notification of the appointments and the examination should be rescheduled and the results utilized to make the disability determination. While the

> Social Security Regulations ("SSR") permit an ALJ to deny benefits on the basis of the claimant's failure to cooperate . . . the case law on the matter illustrates that the failure to appear for a scheduled examination is rarely seen as a definitive bar to benefits, and that courts will look to see if the ALJ had substantial evidence for his decisions in the absence of the evaluation . . . Indeed, the Social Security

> Administration itself has noted that it is the agency's policy
> not to impose the sanction of denial of benefits but instead
> to decide the claim on the basis of the remaining evidence.

Marizan ex rel. A.O. v. Colvin, No. 13-CV-3428 (VEC/FM), 2014 WL 3905922, at *10,

n.8 (S.D.N.Y. Aug. 11, 2014) (internal quotation marks, quotations and citations

omitted).  It is clear from the ALJ's decision that he did not penalize Farina for failing to

attend any of the consultative examinations.  Moreover, it is clear that further

examination was unnecessary in light of the psychiatric evaluation completed by Dr.

Coleman.  These findings, produced to the ALJ by the plaintiff from the plaintiff's own

retained expert, represented a current assessment of Farina's condition and filled any

potential gap in the medical record.  The ALJ also described in great detail the weight

which was given to each opinion and the claimant's own testimony and why, again

militating against any allegations that the ALJ penalized Farina for not attending the

previously scheduled consultative examinations.


## 2. Severity

Farina next contends that the ALJ's evaluation of medical listing 12.05D was not

supported by substantial evidence in the record.  Specifically, Farina contends that the

ALJ improperly evaluated the evidence when determining whether she had marked

limitations in various categories.  Pl. Mem. of Law at 8.

Listing 12.05, the listing for intellectual disability, states in relevant part:

> Intellectual disability refers to significantly subaverage
> general intellectual functioning with deficits in adaptive
> functioning initially manifested during the developmental
> period; i.e., the evidence demonstrates or supports onset of

the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . .

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05.

There is no dispute that deficits in adaptive functioning were manifested prior to age twenty-two or that Farina has a valid full scale IQ score between 60 through 70. To the extent Farina attempts to allege that the full scale IQ score should be lower, as evidenced by the 1993 examination, such contentions are insufficient to disturb the ALJ's finding for the reasons discussed supra Section II(D)(1).

The ALJ determined that Farina has (1) mild restrictions in her daily living; (2) moderate difficulties in her social functioning; (3) moderate difficulties with her concentration, persistence and pace; and (4) no reported episodes of decompensation. T. 24-25. Accordingly, Farina did not satisfy the second prong of the standard dictated in 12.05D and therefore, was not disabled per se.

Farnia disagrees with these categorizations, contending that the evidence demonstrates marked limitations in her activities of daily living and maintaining

concentration, persistence or pace.  Pl. Mem. of Law at 11-12.  Farina has not disputed

the limitations indicated for her social functioning or episodes of decompensation.

Pursuant to 12.05D, in order to meet a listing a claimant must have marked limitations

in two of the three listed areas.  Accordingly, in order for Farina to meet the Listings,

marked limitations would have to be found in both of these categories.  A marked

limitation signifies a limitation which is "more than moderate but less than extreme . . .

aris[ing] when several activities or functions are impaired, or even when only one is

impaired, as long as the degree of limitation is such as to interfere seriously with your

ability to function independently, appropriately, effectively, and on a sustained basis."

20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00C (citing 20 C.F.R. §§ 404.1520a &

416.920a).


### i. Activities of Daily Living

> Activities of daily living include adaptive activities such as
> cleaning, shopping, cooking, taking public transportation,
> paying bills, maintaining a residence, [and] caring
> appropriately for your grooming and hygiene . . .  "marked
> [impairments" are not defined] by a specific number of
> different activities of daily living in which functioning is
> impaired, but by the nature and overall degree of
> interference with function[, looking at whether there is]
> serious difficulty performing [activities of daily living] without
> direct supervision, or in a suitable manner, or on a
> consistent, useful, routine basis, or without undue
> interruptions or distractions.

I 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00C(1).

The ALJ stated that Farina had mild restrictions because she was able to

independently care for her two infant children with some assistance from her neighbor

and daily instruction from her husband.  T. 24.  This is consistent with Farina's testimony, as well as her boyfriend.  T. 50 (explaining that Farina wakes at 7:30 every morning with her children and independently spends the day taking care of her home and children); T. 52 (explaining her ability to do laundry unassisted); T. 62-63 (explaining that Farina is a good mother but calls daily to have her boyfriend talk her through problem shooting when their infant son is upset).  Farina adequately completes the housework and her boyfriend assists her by creating lists of chores for her to accomplish.  T. 50, 62 (explaining that despite Farina's self-assessment she is an adequate housekeeper), 63.  Farina also testified that she requires no assistance with her personal hygiene.  T. 50.  This is consistent with the prior examinations completed by Dr. Noia (T. 250) and Dr. Toor (T. 254) in 2011.  Farina also stated to Dr. Toor that she could cook, clean, do laundry, and take care of her children.  T. 254.

Testimony from the hearing explained that Farina could not count change (T. 58), but that she could count and make change with dollar bills (T. 64).  Farina also explained that she had difficulty reading, which led to difficulties with cooking as well due to reading the recipes.  T. 55.  Farina also had difficulty reading the bottles to measure formula for her children, but through watching her boyfriend make the bottles she was able to learn how to do it herself so that she can feed her children while he is at work.  T. 50.  Farina is using the same techniques to attempt to learn how to give her children medication.  T. 56.

The testimony of Farina's ability to generally independently care for her children and household and attend to her personal hygiene serve as substantial evidence of an impairment which is less than marked.  As previously discussed, "[t]he reviewing court

may not . . . second guess the Commissioner's decision even if it might justifiably have reached a different result upon a de novo review," if substantial evidence adequate to support a conclusion of disability is present. Morales ex rel. Morales v. Barnhart, 218 F. Supp. 2d 450, 458 (S.D.N.Y. 2002) (citations omitted). Therefore, despite the fact that there was also testimony indicating that Farina had difficulty with some of her activities of daily living, there was another greater body of evidence which was sufficient to conclude that she did not. Accordingly, the determination of the ALJ should be affirmed.

### ii. Concentration, Persistence and Pace

Because substantial evidence supports the ALJ's contention that Farina has only moderate limitations with her activities of daily living, even if substantial evidence did not support a moderate limitation in concentration, persistence and pace, it would be of no matter. Even with a more severe limitation, Farina does not have enough additional limitations to qualify her with a disability per se.

With respect to concentration, persistence and pace, the evaluation is similarly centered around

> the nature and overall degree of interference with function . . . if [claimant] can complete many simple tasks, [there] may nevertheless [be] . . . a marked limitation in concentration, persistence, or pace if [claimant] cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00C(3).

Farina points to testimony from the hearing about constantly forgetting and having to be reminded of her duties to go retrieve carts and come back from her breaks in a timely manner, which eventually resulted in her getting terminated from her job (T. 42-43); having an inability to concentrate on completing a task when several people were around her (T. 55); and forgetting her household chores (T. 51-52, 56-57, 63) and argues that these facts signify a finding of a marked limitation in concentration. The ALJ states that a moderate limitation in this area is appropriate because despite Farina's issues forgetting tasks and instructions, she is able to rely upon lists left by her boyfriend and his verbal instructions over the phone to properly care for their home and children. T. 25.

The psychological examination completed by Dr. Noia also indicates that Farina had memory problems, but supports the ALJ's RFC finding. Dr. Noia noted that Farina's "recent and remote memory skills were mildly to moderately impaired," however he concluded that

> [v]ocationally, [Farina] appears to be capable of understanding and following simple instructions and directions. She appears to be capable of performing simple tasks with supervision and independently. She appears to be capable of maintaining attention and concentration for tasks. She can regularly attend to a routine and maintain a schedule. She appears to be capable of learning simple new tasks [and] . . . making simple appropriate decisions.

T. 251. These conclusions were bolstered by Farina's ability to watch her boyfriend and learn how to independently make bottles, as well as her ability to successfully care for her two infant children without additional hands-on help, only with a phone call and verbal instruction from her boyfriend once a day. These findings corroborate and also

serve as substantial evidence indicating that Farina's limitations in concentration were not marked, but were instead moderate.

Dr. Coleman's medical source statement indicated a range of restrictions regarding memory and concentration, some which were more severe than others.  T. 310. Generally speaking, Dr. Coleman opined that Farina was seriously limited, but not precluded from understanding and accomplishing short and simple instructions and working with others and making simple decisions.  Id.  While some of these conclusions would indicate a more severe restriction, for substantially the same reasons as discussed supra, substantial evidence still exists to support the ALJ's determination. Alternatively, even if substantial evidence did not support the ALJ's findings, having only one marked limitation would be insufficient to qualify for a per se disability under the Listings.  Therefore, the ALJ's decision should be affirmed.


### 3. Credibility

The ALJ found that Farina's statements concerning the "intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  T. 26.  Farina contends that the ALJ improperly discounted her credibility claiming that the ALJ generally mischaracterized the testimony and medical evidence.

The ALJ determines whether an ailment is an impairment based on a two-part test. First, the ALJ must decide, based upon objective medical evidence, whether "there [are] medical signs and laboratory findings which show . . . medical impairment(s) which

could reasonably be expected to produce [such] pain. . . ." <u>Barringer v. Comm'r of Soc. Sec.</u>, 358 F. Supp. 2d 67, 81 (N.D.N.Y. 2005); 20 C.F.R. § 404.1529 (2003). This primary evaluation includes subjective complaints of pain. 20 C.F.R. § 404.1529 (2003). "'Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.'" <u>Barringer</u>, 358 F. Supp. 2d at 81 (quoting <u>Crouch v. Comm'r of Soc. Sec. Admin.</u>, No. 6:01-CV-0899 (LEK/GJD), 2003 WL 22145644, at *10 (N.D.N.Y. Sept. 11, 2003).

An ALJ must consider all symptoms, including pain, and the extent to which these symptoms are consistent with the medical and other evidence. 20 C.F.R. § 404.1529 (2003). The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment. <u>See</u> <u>Marcus v. Califano</u>, 615 F.2d 23, 27 (2d Cir. 1978). The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (i) [The claimant's] daily activities;
>
> (ii) The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other

symptoms;

(vi) Any measures [the claimant] use[s] or ha[s] used to
relieve . . . pain or other symptoms (e.g., lying flat on [his]
back, standing for 15 to 20 minutes every hour, sleeping on
a board, etc.); and

(vii) Other factors concerning [the claimant's] functional
limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

Farina contends that the ALJ did not describe why he found her testimony to be
incredible. These claims are unsupported, as the ALJ discussed for four pages, in
great detail, the substance of the testimony and medical evidence, the conclusions
drawn, any perceived inconsistencies, and the weight attributed to each source. T. 25-
29. To the extent that Farina contends that the ALJ mischaracterized an exchange
between himself and Farina about her reasons for not working, that exchange was not
ultimately relied on in the ALJ's assessment and disability determination. Even if the
exchange was mischaracterized, such would account for harmless error as the ALJ
relied on a large body of substantial evidence, as outlined supra, to support his RFC
determination as to why Farina's intellectual disability was severe, but not per se
disabling. Further, for the reasons previously discussed, the psychological
assessments which were provided were clear, unambiguous, and complete. The
testing was comprehensive and resulted in full scale IQ figures which served as a
reasonable basis for comparison. There is no evidence presented to contradict that
fact. Therefore, the conclusions from the 1993, 1996 and 2012 assessments were all
appropriate to use in making determinations about Farina's capabilities. Accordingly,
the ALJ's decision should be affirmed.

## 4.Step Five of the Sequential Analysis

Under the Social Security Act, the Commissioner bears the burden of proof for the final determination of disability. Pratt v. Chater, 94 F.3d 34, 38 (2d Cir. 1996). Generally speaking, if a claimant suffers only from exertional impairments, then the Commissioner may satisfy his burden by resorting to the applicable rule of the Medical–Vocational Guidelines set forth at 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly called "the Grids" or the "Grid").[8] Pratt, 94 F.3d at 39. The function of the Grids was succinctly summarized by the court in Zorilla v. Chater, 915 F.Supp. 662, 667 (S.D.N.Y.1996) as follows:

> In meeting [his] burden of proof on the fifth step of the sequential evaluation process described above, the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability.

Ordinarily, the ALJ need not consult a vocational expert, and may satisfy this burden "by resorting to the applicable medical vocational guidelines (the grids)". Id. at 78 (citing 20 C.F.R. Pt. 404, Subpt. P, App.2).

The Second Circuit has held that "the mere existence of a nonexertional impairment

---

[8] An "exertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e. sitting, standing, walking, lifting, carrying, pushing, and pulling). 20 C.F.R. §§ 404.1569a(b), 416.969a(b); see also Rodriguez v. Apfel, 1998 WL 150981, at *10, n. 12 (S.D.N.Y.1998).

does not automatically require the production of a vocational expert or preclude reliance" on the grids.[9] Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir.1986). The testimony of a vocational expert that jobs exist in the economy which claimant can obtain and perform is required only when "a claimant's nonexertional impairments significantly diminish his ability to work-over and above any incapacity caused solely from exertional limitations-so that he is unable to perform the full range of employment indicated by the medical vocational guidelines." Id. The use of the phrase "significantly diminish" means the "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity". Id. at 606. Under these circumstances, to satisfy his burden at step five, the Commissioner must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." Rosa, 168 F.3d at 78 (quoting Bapp, 802 F.2d at 604). Therefore, when considering nonexertional impairments, the ALJ must first consider the question-whether the range of work the plaintiff could perform was so significantly diminished as to require the introduction of vocational testimony. Samuels v. Barnhart, 2003 WL 21108321, at *12 (S.D.N.Y.2003) (holding that the regulations require an ALJ to consider the combined effect of a plaintiff's mental and physical limitations on his work capacity before using the

_____

[9] A "nonexertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Examples of nonexertional limitations are nervousness, inability to concentrate, difficulties with sight or vision, and an inability to tolerate dust or fumes. 20 C.F.R. §§ 404.1569a(a), (c)(i), (ii), (iv), (v), 416.969a(a), (c)(i), (ii), (iv), (v); see also Rodriguez , 1998 WL 150981, at * 10, n. 12.

grids).

The ALJ should elicit testimony from the expert by posing hypothetical questions. If a hypothetical question does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability.  <u>Melligan v. Chater</u>, 1996 WL 1015417, at *8 (W.D.N.Y.1996). The "[p]roper use of vocational testimony presupposes both an accurate assessment of the claimant's physical and vocational capabilities, and a consistent use of that profile by the vocational expert in determining which jobs the claimant may still perform." <u>Lugo v. Chater</u>, 932 F.Supp. 497, 503 (S.D.N.Y.1996).  Further, there must be "substantial evidence to support the assumption upon which the vocational expert based his opinion." <u>Dumas v. Schweiker</u>, 712 F.2d 1545, 1554 (2d Cir.1983).

The ALJ determined that Farina suffered from nonexertional limitations (T. 30); therefore, he obtained testimony from a VE (T. 66-73).  The ALJ asked the VE to "assume a person with claimant's age, education and work experience, has no exertional limitations . . . [but] would be limited to simple, routine, repetitive tasks in a work environment free of fast-paced production requirements and would involve only simple work related decisions, couldn't deal with any workplace changes."  T. 68.  The VE then responded that there were several jobs which such an individual could perform, including a housekeeper with 5,000 jobs in New York and 515,000 jobs nationwide (T. 68); a laundry worker with 2,200 jobs in New York and 190,000 jobs nationwide (T. 68); and a linen/laundry sorter with 2,200 jobs in New York and 120,000 jobs nationwide (T. 68-69).

Using a VE's testimony "is a proper means of fulfilling the agency's burden at step five

25

. . . to establish the existence of jobs in sufficient numbers in the national and regional economy . . . ." <u>Pardee v. Astrue</u>, 631 F. Supp. 2d 200, 222 (N.D.N.Y. 2009) (citations omitted). So long as "the factors set forth in the hypothetical are supported by substantial evidence, then the [VE's] testimony may be relied upon by the ALJ in support of a finding of no disability." <u>Id.</u> (citations omitted). In this case, the ALJ provided the VE with a hypothetical which incorporated all of the limitations which were included in the RFC. These limitations, for the reasons discussed <u>supra</u>, were all supported by substantial evidence. Thus, the VE considered all of Farina's limitations in identifying specific jobs that she could perform and identified numerous occupations in sufficient numbers in which Farina could engage. Farina's argument that these jobs were categorized as unskilled labor which, accordingly to the ALJ's RFC determination she was unable to perform, is unavailing. Pl. Mem. of Law at 15-16. The ALJ was specific in stating that Farina retained the RFC to engage in a certain range of work activities limited by the previously stated confines of the hypothetical. Accordingly, despite the general classifications of the jobs stated by the VE, namely that they were unskilled, the VE appropriately considered all of the limitations unique to Farina and still concluded that she was able to find employment. As previously discussed, the ALJ properly relied upon this testimony which serves as substantial evidence meeting the Commissioner's burden of proof under step 5 of the evaluation. Accordingly, the ALJ's decision should be affirmed.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that Farina's motion for judgment on the pleadings (Dkt. No. 13) be **DENIED** and the Commissioner's decision finding disability be **AFFIRMED**.

Pursuant to 28 U.S.C. §636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989); 28 U.S.C §636(b)(1); FED R. CIV. P. 72, 6(a), 6(e).

It is further **ORDERED** that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Date:  September 3, 2014
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge